JM:MLY
F.#2010R01153

M-10-841

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

COURTNEY DUPREE,
RODNEY WATTS,
THOMAS FOLEY
and
FRANK PATELLO,

Defendants.

- - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. §§ 1349 and 3551 et seq.)

GAVIN P. SHEA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

There is probable cause to believe that in or about and between January 2007 and June 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants COURTNEY DUPREE, RODNEY WATTS, THOMAS FOLEY, FRANK PATELLO and others did knowingly and intentionally conspire to execute a scheme and artifice to commit bank fraud, mail fraud, and wire fraud, contrary to Title 18, United States Code, Sections 1344 (bank fraud), 1341 (mail fraud), and 1343 (wire fraud), respectively.

(Title 18, United States Code, Section 1349.)

The source of my information and the grounds for my belief are as follows[1]:

1. I have been employed as a Special Agent with the FBI for 15 years, and am currently assigned to the white collar crime squad. I am one of the case agents with primary responsibility for this investigation. I am also a certified public accountant with public and private accounting experience of more than six years. While working for the FBI, I have participated in numerous investigations of criminal activity, and I have spent twelve years investigating white collar crime, including bank fraud, securities fraud, telemarketing fraud, money laundering schemes, and other types of schemes. During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, the execution of search warrants, debriefings of informants, and reviews of taped conversations and financial records.

2. I am familiar with the information contained in this affidavit based on my personal participation in the investigation, my review of documents, my training and experience, and my discussions with other law enforcement personnel concerning the investigation. Additionally,

---

[1] Because the purpose of this affidavit is only to establish probable cause to arrest the defendants, I have not included each and every fact known to me concerning this investigation.

statements herein attributable to individuals are set forth in substance and in part.

**THE SCHEME TO DEFRAUD**

3. Conspirators COURTNEY DUPREE, RODNEY WATTS, THOMAS FOLEY and FRANK PATELLO orchestrated a scheme to defraud Amalgamated Bank by obtaining loans for subsidiaries of GDC Acquisitions, LLC ("GDC"), a holding company that the conspirators operated and controlled, on the basis of false financial statements and other misrepresentations.[2] As a result of the conspirators' fraud, GDC has obtained approximately $21 million in loans from Amalgamated Bank, an FDIC insured institution.

4. During the relevant time period, the conspirators operated and controlled GDC. DUPREE is the president of the company, WATTS is the chief investment officer, FOLEY is the chief operating officer, and from in or about March 2008 to in or about March 2010, PATELLO was the controller and chief financial officer ("CFO"). FOLEY is a lawyer, and before he

---

2 GDC has numerous subsidiaries, including JDC Lighting, LLC ("JDC Lighting"), a lighting distributor, and Unalite Electric and Lighting, LLC ("Unalite"), a lighting maintenance company, and Hudson Bay Environments Group, LLC ("Hudson Bay"), a furniture distributor. GDC is privately owned. Other subsidiaries include TDC Acquisitions, LLC, Interconnect Lighting, LLC, Image Lighting Services, LLC, Image Lighting, LLC, Image Lighting Corp., Unalite Southwest, LLC, Unalite NJ, LLC, and Unalite Distribution, LLC.

joined GDC full time in or about January 2010, he acted as the company's outside counsel.

5. The conspirators inflated GDC's accounts receivable[3] on the consolidated financial statements and Borrowing Base Certificates or "BBCs" that it supplied to Amalgamated Bank. According to confidential source #1 ("CS-1"), the conspirators have achieved this result by a variety of means, including (i) booking fictitious sales, thereby creating fictitious accounts receivable; (ii) "re-aging" or re-dating the accounts receivable so that they appeared to have been incurred more recently, and were thus more valuable; (iii) prematurely recognizing sales and the corresponding revenue, thereby creating accounts receivable before the appropriate time under generally accepted accounting principles; and (iv) posting cash received from customers as liabilities in order to avoid reducing the accounts receivable balances. In addition, the conspirators defrauded Amalgamated Bank by having GDC purchase a company covertly, contrary to the terms of their loan agreement, and by having GDC conceal the fact of the purchase.[4]

---

[3] "Accounts receivable is money owed to a business by customers who have bought goods or services on credit. Accounts receivables are current assets that continually turn into cash as customers pay their bills." David L. Scott, Wall Street Words 3 (3d ed. 2003).

[4] See Section II, supra.

I. The Fraudulent Financial Statements

6. On August 29, 2008, JDC Lighting, Unalite, and Hudson Bay entered into a $21 million Revolving Credit and Term Loan Agreement with Amalgamated Bank (the "Agreement"); GDC signed as the guarantor. A Subordination and Intercreditor Agreement appended to the Agreement provides that GDC's existing creditors, MVC Capital, Inc., Steelcase Inc., and Steelcase Financial Services, Inc. are junior creditors to Amalgamated Bank. DUPREE signed the Agreement, and FOLEY acted as counsel to the subsidiaries in connection with the Agreement. The loans were both secured, in part, by GDC's accounts receivable. The Agreement required that GDC submit BBCs to Amalgamated Bank each month that were certified as accurate by an officer of GDC. While he was the CFO of the company, PATELLO certified numerous BBCs.

7. The BBCs contained numerous falsehoods. For example, in a consensually recorded conversation on May 19, 2010, PATELLO stated that GDC had only $9 million in accounts receivable in November 2009. The BBC submitted in November 2009 that PATELLO certified, however, claimed that GDC had $25.2 million in accounts receivable.

8. The conspirators had numerous conversations and communications over email in which they discussed creating fake accounts receivables. For example, on September 9, 2009 at 9:07

p.m., CS-1 sent an email to PATELLO asking "Do you really want me to come up with 2.4 in sales for JDC in August?" PATELLO replied in an email sent that same day at 10:32 p.m.: "Simple answer - YES". According to CS-1, the sales would then be booked as fictitious accounts receivable.

9. The conspirators booked the fictitious sales and accounts receivable in order to preserve the revolving credit facility with Amalgamated Bank. In a consensually recorded conversation on May 14, 2010, WATTS talked with CS-1 about the need to create additional sales of two million dollars so GDC could borrow additional money from the credit line. Watts told CS-1: "but at the time we had about, we had less than three hundred thousand dollars worth of availability." Watts than said "So what we're talking about is a million and a half divided by point seven which is two million dollars". This was necessary, Watts explained, because "that way we can hit the hurdle what I need to hit." Watts also told CS-1 that if the bank examiners required more accounts receivable detail to test, than they would just re-bill more fictitious sales and change invoice amounts so the fraud would not be detected by the bank: "we'll just bill it again and break [it] up with the invoices." Watts then explained to CS-1 why they needed to book additional fictitious sales and receivables: "[T]he reason why we want to have a million and a half is because we were gonna ask

[Amalgamated Bank's representative] for six or seven hundred thousand more."

10. The conspirators also discussed methods for creating fake accounts receivable. In an email that WATTS sent to PATELLO and CS-1 on June 13, 2009 at 3:28 p.m., WATTS directed his coconspirators to spread out fake sales, which would be reflected as accounts receivable, over several months in order to make the manipulation harder for Amalgamated Bank to detect:

> Revised financials are attached. My suggestion is that the revenue adjustments to [GDC's subsidiary] JDC [Lighting, LLC] be made in each of the first four months of the year, so that the effect is not all recognized in April. I recognize that this [is] probably more complicated, but remember they asked for monthly financials for the last two years, so at minimum they will be looking at the numbers by company, by month.

According to CS-1, "revenue adjustments" referred to fake sales and corresponding fake accounts receivable. In a consensually recorded conversation on May 14, 2010, DUPREE made clear that GDC would continue to manipulate its financial statements in the present by pre-billing sales even as he pledged to cease the practice in the future. Dupree stated: "[S]o the reason why Rodney wanted you to zero it out, is because . . . after the audit is done after the bank exam, we were going to bill shit

the proper way. I don't wanna be in anymore pre-billing shit. . . . I'm not gonna be doing any more fucking pre-billing."

11. In a consensually recorded conversation on May 18, 2010, DUPREE told CS-1 that he believed Amalgamated Bank was concerned whether it had "enough collateral to cover the loan"; "enough cash flow to cover that." In other words, DUPREE made it clear that he believed the amount of GDC's accounts receivable was material information to Amalgamated Bank.

12. The conspirators' communications with each other show how much effort was required to maintain the fraud. On December 25, 2009, DUPREE sent PATELLO an email questioning why a company of GDC's size needed twenty people working on accounting issues. On January 2, 2010 at 2:38 p.m., PATELLO responded:

> I do not know that you fully understand how much time, energy and effort truly is required to cover up all the bs I have to take care of in order for us to pass muster. I think this [is] something we really need to go over. More than 50% of my time . . . is spent covering our trail.

13. According to CS-1, the conspirators maintained two separate databases that were essentially aged accounts receivable ledgers[5]: the "Production" database, and the "Zulu"

---

[5] "Aging" is a method for evaluating a company's accounts receivables. "It is carried out by grouping a firm's accounts receivables according to the length of time accounts have been outstanding. For example, a financial analyst may use aging to determine whether a firm carries many overdue debtors that may

database. The Production database was used to provide accounts receivable data to the outside auditor, J.H. Cohen, LLP. The Zulu database was used to provide accounts receivable to Amalgamated Bank. CS-1 stated that both databases contained false information, but that the Production database contained some real and accurate information, while the Zulu database had much more false data. The Zulu database was named by WATTS in March 2010 after CS-1 told WATTS that he wanted a name for the database, so that he would not have to call it the "fake" database. In response, WATTS came up with the name "Zulu."

14. In addition to the Production and Zulu databases, the conspirators maintained a separate spreadsheet that CS-1 called the "A/R Reconciliation." This spreadsheet showed the differences between (i) GDC's actual accounts receivable balance, (ii) the accounts receivable balance in the Production database and (iii) the accounts receivable balance in the Zulu database. This document was stored on the GDC server and was available to WATTS and PATELLO.

15. In or about March 2010, CS-1 visited FOLEY in his office at GDC and spoke to FOLEY about the fraud. CS-1 told FOLEY that the financial information that GDC gave to

---

never pay their bills." Scott, supra note 3 at 9. Here, "aged accounts receivable ledgers" means ledgers that group accounts receivables by the length of time that they have been outstanding.

Amalgamated Bank was not accurate. FOLEY responded that the situation was not a criminal matter or a fraud, but merely a breach of contract issue between GDC and Amalgamated Bank. FOLEY told CS-1 that GDC's situation was the same as when a person taking out a mortgage tells the bank that the property would be used as a principal residence, but then turns around and rents out the property. In that circumstance, FOLEY said to CS-1, it would be just a contract issue, not a fraud.

16. On April 24, 2010, a Saturday, CS-1 went into work to prepare accounts receivable figures to give Amalgamated Bank the following Monday. FOLEY walked over to CS-1's cubicle and asked what CS-1 was doing in the office. CS-1 said: "cooking the books."

17. In May 2010, Amalgamated Bank reviewed GDC's books pursuant to the terms of the Agreement. The defendants expressed relief and amazement that Amalgamated Bank did not discover the fraud. In a consensually recorded conversation on May 18, 2010, DUPREE told CS-1 that he thought that "the uh . . . bank exam went fine. It's a miracle." This was crucial, DUPREE said, and more important than the results of the audit of GDC's financial statements (which would be conducted by J.H. Cohen LLP): "[T]he audit was always a secondary concern relative to the bank exam. The bank exam was the issue." Indeed, DUPREE

stated that fear of the bank exam was the reason that PATELLO had left GDC in or about March 2010:

> The bank exam is why Frank [PATELLO] ran out of here naked and jumped off the roof.

CS-1 responded "I think he was concerned about all the shit he did." As shown above, DUPREE had also been concerned, but he explained to CS-1 that he had experience maintaining the fraud for years before PATELLO came to the company:

> Of course he was [concerned]. But you don't fucking do all that and not fucking understanding (UI) there's a way around it and then uh . . . He doesn't think I'm a fucking CPA and uh . . . he doesn't know everything about finance or what have you so what the fuck does Courtney know. Fine, but I fucking know I'm a hell of a lot smarter than you and I've done this for fucking six years and for five years before you got here.

When PATELLO learned that GDC had slipped through the May bank exam in a consensually recorded conversation with CS-1 on May 19, 2010, PATELLO was also surprised and relieved:

> How the fuck could that be? I don't …I…I…I…I mean that's, that's wonderful. I just don't get it. Alright. Well … I mean that's good news. That's good news.

Unlike DUPREE, however, PATELLO was less convinced of the wisdom of the scheme. As he stated in an earlier consensually recorded conversation with CS-1 on May 17, 2010:

> See the shame of it is, it took me too long to recognize how much of an issue it was. You know, when you're in it you don't even think about it.
>
> CS-1: Yeah.

FP: That's what you do. And then all of a sudden you're on the outside looking in and saying, wow, how fuckin' stupid can I be? And I have to tell you, pretty stupid.

## II. The Attempted Fraud Against C3 Capital, Inc.

18. CS-1 stated that in August 2009, the conspirators attempted to obtain a loan from C3 Capital, LLC ("C3 Capital") through fraud. Specifically, the conspirators sent C3 Capital fraudulent financial statements in order to convince C3 Capital to loan money to GDC. In an email sent to PATELLO on August 4, 2009, a representative of C3 Capital acknowledged receipt of financials from GDC, but asked for financial information on the subsidiary level as well. C3 Capital ultimately did not lend money to GDC or its subsidiaries.

## III. The "Off the Books" Purchase of Image Lighting, Inc.

19. According to CS-1, WATTS and PATELLO had told him, in substance, that Amalgamated Bank, GDC's biggest creditor, had told GDC that it did not want GDC to purchase any additional companies. CS-1 further stated that if GDC were to buy additional companies, the purchases would alter GDC's ratio of debt to equity.

20. I have reviewed the Agreement that Amalgamated Bank entered into with GDC (as guarantor) and GDC's subsidiaries on August 29, 2008, and have seen that the Agreement limits the ways in GDC's subsidiaries can use the borrowed money.

Specifically, Sections 6.04 ("Investments") and 6.08(a) ("Debt to Equity Ratio") limit the ability of GDC and its subsidiaries to acquire new companies. Section 6.04 (under Section 6, "Negative Covenants") restricts the forms of investments that GDC's subsidiaries can make.

> Each Borrower agrees that, so long as this Agreement is in effect, any Loan remains outstanding and unpaid, or any other amount is owing under any Loan Document to the Bank, the Borrowers shall not, directly or indirectly:
>
> . . . . Make any loan or advance to, or enter into any arrangement for the purpose of providing funds or credit to, or make any other investment, by capital contribution or otherwise, in or with any Person (each of the foregoing, an "Investment"), except (i) any money market account maintained at the Bank or investment account maintained at an affiliate of the Bank and (ii) extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit on customary terms in the ordinary course of business.

Section 6.08(a) provides that "the Borrowers shall maintain a Debt to Net Worth Ratio . . . of not more than 3.00 to 1.00."

21. Emails between DUPREE, WATTS, and FOLEY indicate that GDC was negotiating to acquire Image Lighting, Inc. ("Image Inc."), a lighting distributor in New Jersey, as early as June 2008. My investigation has also revealed that GDC sent a letter of intent dated June 12, 2008 to Image Inc. that stated its intent to purchase Image Inc.'s assets.

22. In August 2008, CS-1 was tasked with doing due diligence on Image Inc. WATTS and PATELLO told CS-1 that GDC would purchase Image Lighting, Inc. "off the books" so that Amalgamated Bank would not learn of the acquisition. WATTS and PATELLO directed CS-1 to transfer Image Inc.'s accounts receivable, which totaled approximately $1.9 million, onto GDC's books. The asset purchase agreement with Image Inc. had excluded Image Inc.'s accounts receivable and accounts payables. Notwithstanding this fact, PATELLO instructed CS-1 to transfer the accounts receivable as of October 2008, even though GDC's purchase of Image Inc. did not close until December 2008.

23. GDC hid its purchase of Image Inc. from Amalgamated Bank by having the money ostensibly come from other sources, including a subsidiary and DUPREE's personal bank account. More specifically, half of the money to purchase Image Inc. was provided by DUPREE personally, and half was provided by FOLEY's law firm. FOLEY's law firm had received the money from a phony vendor that FOLEY had incorporated for GDC, and the phony vendor in turn had received the money from JDC Lighting, LLC ("JDC Lighting"), a subsidiary of GDC.

24. CS-1 stated that in order to accomplish the purchase of Image Inc., the conspirators had to falsify supporting documents for the transaction, including sales invoices and accounts receivable ledger detail. In addition,

CS-1 stated, accounts payable also had to be falsified so that it would appear that GDC was transferring money in order to pay a vendor, not to buy a company. The "vendor payment" would then be transferred back to GDC and reflected as payments against GDC's outstanding accounts receivable. CS-1 stated that the fake vendor the conspirators created was named "Interconnect." CS-1 further stated that to make the payments, the conspirators set up multiple bank accounts and then funneled the money through these various accounts to hide the true nature of the transaction. After funneling funds out of GDC through a bogus vendor payment, the conspirators broke the amounts down into smaller payments on the accounts receivable ledger so that GDC's outside auditors and Amalgamated Bank would not discover the fraud.

25. In addition to the conspirators' efforts to conceal the ultimate source of the money, the conspirators also hid the purchase of Image Inc. from Amalgamated Bank by dividing up the company they purchased. That is, GDC created separate entities to purchase Image Inc.'s assets and hire Image Inc.'s employees. On or about November 18, 2008, FOLEY, who was not yet GDC's chief operating officer, but rather acting as GDC's outside counsel, incorporated a new company in New Jersey named "TDC Acquisitions LLC" ("TDC"). GDC was listed as the sole shareholder. Then, on or about November 25, 2008, FOLEY

incorporated another company in New Jersey, "Image Lighting LLC" ("Image LLC"). TDC purchased the assets, and Image LLC hired the employees of Image Inc., the old company. DUPREE explained the structure and alluded to the reason for it in an email to FOLEY and WATTS on June 30, 2008 at 5:02 p.m.:

> Tom, I am attaching a [letter of intent] that was executed a few weeks ago for a small company in New Jersey that we intend to acquire shortly (a week) after our refinancing.
>
> . . .
>
> Can you have someone on your staff draft a simple asset purchase agreement? The only nuance is that we will acquire the company in two pieces. A newco (TBD) will acquire the assets of Image Lighting. We are not taking the A/R and A/P, which will stay with the company. So the primary asset will be intangibles. The employees will be hired by GDC Acquisitions, LLC under a separate newco from that acquiring the assets, Image Lighting, LLC. That's it. The cash ($800,000) will be provided by Newco (acquisition) and the employment agreement will be guaranteed by GDC Acquisitions, LLC.
>
> It's not really as confusing as it sounds and there is a business reason behind the somewhat convoluted structure. Let's talk after you've had some time to formulate questions.

26. In or about December 2008, GDC closed on the purchase of Image Inc. As specified in DUPREE's email to FOLEY and WATTS on June 30, 2008 at 5:02 p.m., GDC bought Image Inc. for $800,000. CS-1 stated that half of that $800,000 was paid by DUPREE personally, and half was paid by FOLEY's law firm with money from Interconnect Lighting, LLC ("Interconnect"), a phony vendor that FOLEY had incorporated for GDC on November 25, 2008.

The sole shareholder of Interconnect was listed as S.H., whose address was listed as 47-07 32nd Place, Long Island City, NY 11101, where GDC's offices are located. CS-1 stated that S.H. is DUPREE's fiancée. As noted above, Interconnect in turn had received the money from JDC Lighting.

27. In addition to concealing GDC's purchase of Image Inc. from Amalgamated Bank, the conspirators were also careful to conceal the true nature of the transaction from their auditors. On December 13, 2008, at 12:24 p.m., CS-1 sent an email to PATELLO noting that the purchase might be inadvertently disclosed in attorney's bills that include the name of J.M., the old owner of Image Inc. who stayed with the company after GDC's purchase:

> I just thought [of] a problem that just came up when I was looking at Attorney bills. When the auditors review the bills for Tom Foley they are going to see that he drafted a Purchase agreement with Image Lighting and [J.M.] and then they are going to see [J.M.] working for us when they look at the employment agreement.

PATELLO responded to CS-1 later that same day, at 2:04 p.m., in an email that he also addressed to DUPREE. In his message PATELLO complimented CS-1 on his attention to detail and noted the need to hide the information:

> Great catch - we will need to talk to Tom [FOLEY] and see how we can modify the bills before they get submitted. We do t is [sic] on Monday. We also need to review all legal bills as well to make sure we don't have any other issues.

After this exchange, CS-1 saw an altered set of legal bills from FOLEY's law firm.

**CONCLUSION**

28. Based on all of the foregoing information, I conclude that there is probable cause to believe that COURTNEY DUPREE, RODNEY WATTS, THOMAS FOLEY, FRANK PATELLO and others did knowingly and intentionally conspire to execute a scheme and artifice to commit bank fraud, mail fraud, and wire fraud contrary to Title 18, United States Code, Sections 1344 (bank fraud), 1341 (mail fraud), and 1343 (wire fraud), respectively, all in violation of Title 18, United States Code, Section 1349.

WHEREFORE, I respectfully request that the defendants COURTNEY DUPREE, RODNEY WATTS, THOMAS FOLEY, and FRANK PATELLO be dealt with according to law. Furthermore, I respectfully request that this affidavit be filed under seal.

GAVIN P. SHEA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___ day of July, 2010.

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK